IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RYAN R. DOWDY, | § | Case No. 20-42436 |
| | § | (Chapter 7) |
| Debtor. | § | |
| _____ | § | |
| THE GUARANTY COMPANY OF | § | |
| NORTH AMERICA USA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Proc. No. 21-4060 |
| | § | |
| RYAN R. DOWDY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

This matter is before the Court following a trial on the complaint filed by The Guaranty

Company of North America USA (the "**Surety**") seeking to deny Ryan R. Dowdy (the "**Debtor**")

a bankruptcy discharge based on his alleged false oaths pursuant to 11 U.S.C. § 727(a)(4)(A).  This

memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to

Rule 52 of the Federal Rules of Civil Procedure, as adopted and applied to this proceeding by

Federal Rule of Bankruptcy Procedure 7052.  The Court has jurisdiction over this matter pursuant

to 28 U.S.C. §§ 1334 and 157(a), and the standing order of reference in this district.  This matter

is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(J) and meets all constitutional

standards for the proper exercise of full judicial power by this Court.

### SUMMARY OF THE DISPUTE

The Surety objects to the Debtor's discharge under § 727(a)(4)(A) of the Bankruptcy Code.

The Surety contends that the Debtor knowingly and fraudulently made false oaths about the use of

Paycheck Protection Program funds and rent revenue during an examination in connection with his bankruptcy case conducted pursuant to Federal Rule of Bankruptcy Procedure 2004. The Debtor contends that he did not knowingly and fraudulently make any false oath as to any material fact or matter during his Bankruptcy Rule 2004 examination. The Debtor specifically denies that he made any materially untrue statements about the use of Paycheck Protection Program Funds by RKM Utility Services, Inc. ("**RKM**") or the use of rents by 2105 Waterview Realty, LLC ("**Waterview Realty**") during his Bankruptcy Rule 2004 examination.

## FACTS

1.      The Debtor is the 100% owner of the stock of RKM and served as its president through December 2, 2020.

2.      The Debtor is a 99% owner of the interests of Waterview Realty, which owned an office building located at 2105 Waterview Parkway in Richardson, Texas. Waterview Realty financed $1.8 million of the $2.3 million purchase price for the building with a loan from the predecessor-in-interest to BancorpSouth Bank ("**BancorpSouth**").

3.      On August 16, 2017, RKM; SHI Machinery, LLC; and the Debtor executed a General Agreement of Indemnity (the "**Indemnity Agreement**") on behalf of the Surety. On April 17, 2018, Waterview Realty executed an Additional Indemnitor Rider on behalf of the Surety. And on June 26, 2019, KMR Transportation, LLC executed an Additional Indemnitor Rider on behalf of the Surety.

4.      The Surety executed numerous construction surety performance, payment, and maintenance bonds (collectively, the "**Bonds**") on behalf of or at the request of RKM for construction projects throughout the State of Texas (collectively, the "**Projects**").

2

5.      The Debtor supervised construction crews for the Projects.  Although he was the 100% owner of RKM and the 99% owner of Waterview Realty, he delegated the financial aspects of the businesses to others.  The Debtor is financially unsophisticated.

6.      In April 2019, RKM borrowed $4 million from Independent Bank.  RKM used the loan to pay a delinquent tax debt for payroll taxes.  The loan, which was due to be repaid in April 2020, was secured by a certificate of deposit with a balance of $4,046,500 owned by the Debtor's father.

7.      By June 2019, the Surety was aware that RKM was experiencing financial problems.  The Surety had received notices of claims for payment under the payment bonds from subcontractors and suppliers of RKM.  These subcontractors and suppliers sought payment for work they performed and/or materials they delivered to the Projects that RKM failed to pay.  The Surety also had received claims from owners under the performance bonds who defaulted RKM for failing to perform its scope of work.

8.      In August 2019, the Surety and RKM executed a Funds Control Agreement establishing an escrow account to manage bonded contract funds.

9.      On February 14, 2020, Sisters Asphalt, Inc. ("**Sisters Asphalt**" or "**SAI**") executed subcontracts to take over RKM's remaining scope of work on the bonded Projects.  From the Surety's perspective, the purpose of this arrangement was to facilitate the completion of the Projects as well as to avoid the costs associated with obtaining a new contractor.

10.     The Debtor's sister had an ownership interest in Sisters Asphalt, and Sisters Asphalt officed at the same building as RKM.

11.     In February 2020, RKM transferred its employees to the payroll of Sisters Asphalt.

12.     In April 2020, RKM borrowed and received $4,165,900.00 (the "**PPP Proceeds**") as a Paycheck Protection Program Loan implemented through the United States Small Business Administration and BOKF, NA, d/b/a "Bank of Oklahoma", pursuant to the "PPP Loan Program" established by the CARES Act that the United States enacted in the Spring of 2020 in response to the Coronavirus pandemic.

13.     The PPP Proceeds were deposited into RKM's operating account.  RKM used the PPP Proceeds to satisfy its $4 million debt to Independent Bank.

14.     After RKM received the PPP Proceeds, Sisters Asphalt transferred RKM's former employees back to RKM's payroll.  Sisters Asphalt continued to receive payments as RKM's subcontractor for the Projects.  Between April and July 2020, Sisters Asphalt wired the total sum of approximately $4.4 million to RKM, which RKM used to pay its employees.

15.     At the end of July 2020, a judgment creditor garnished RKM's payroll account. RKM ceased operating after the garnishment.

16.     RKM filed Form 941 tax returns and reports with the Internal Revenue Service on account of payroll taxes withheld from the employees RKM paid after it received the PPP Loan Proceeds.  RKM submitted its "PPP Loan Forgiveness Application Form 3508EZ", dated October 28, 2020, reflecting total payroll costs of $4,423,324.05 for the applicable period, which is greater than the $4,165,900.00 in PPP Loan Proceeds that RKM received.

17.     The Surety filed suit on November 11, 2020, against the Debtor and the other Indemnitors in the case styled *The Guarantee Company of North America USA v. RKM Utility Services, Inc.; SHI Machinery, LLC; KMR Transportation, LLC; 2105 Waterview Realty, LLC; and Ryan Dowdy*, Civil Action No. 3:20-cv-03366-L (the "**Indemnity Action**") in the United States District Court for the Northern District of Texas.

4

18.     The Debtor filed his voluntary petition seeking Chapter 7 bankruptcy protection on November 24, 2020.

19.     Michelle Chow was appointed as the Debtor's Chapter 7 bankruptcy trustee and has been administering his Chapter 7 bankruptcy estate.

20.     On March 8, 2021, the Surety filed its Proof of Claim seeking recovery of $6,400,000.00.

21.     The Surety and Texas Capital Bank conducted a Bankruptcy Rule 2004 examination of the Debtor on February 23, 2021.  During his Bankruptcy Rule 2004 examination, the Debtor testified that Waterview Realty received approximately $17,000 per month in rent payments and that it dedicated "100%" of those payments towards the BancorpSouth note to remain current on the note.  Following is an excerpt of the exchange between the Debtor and counsel for the Surety:

Q.   Is it fair to say that rent was being paid for this space at 2105 Waterview?
A.· ·Yes.
Q.· ·And if I recall correctly from your meeting of creditors, rent is around $17,000 a month?
A.· ·Yes.
Q.· ·And that rent then would get paid to 2105 Waterview Realty, LLC, correct?
A.· ·Yes.
Q.· ·And you as the sole owner of that entity, is it fair to say, then, that you would be receiving that rental income?
MR. LEWIS:· Object to form.
A.· ·I mean, the money that we received from rent, goes to pay the note.
Q.· ·(BY MR. WEINSTEIN)· Is 100 percent of it going to pay the note?
A.· ·Yes.
Q.· ·And is it only going to pay the bank, or is it going to pay both the bank and Jack Dowdy?
A.· ·Just the bank.
Q.· ·What are the monthly loan payments to BancorpSouth, if you know?
A.· ·I don't know.· But if I were to guess, I would say it would be 17.
Q.· ·Is the note current with Bancorp?
A.· ·I would have to check.· It was -- at the end of the year it was.

22.    The Debtor also testified that RKM used all the PPP Proceeds for a payroll of approximately 100 to 200 RKM employees.  Following is the exchange between the Debtor and counsel for the Surety:

> Q.· ·Do you know about what time period that application was submitted back in 2020?
> A.· ·I would say in around March.
> Q.· ·At the time that RKM was applying for that loan, how many employees did it have?
> Q.· ·Did RKM receive PPP funds?
> A.· ·Yes.
> Q.· ·How much?
> A.· ·I believe it was around 4 million.
> Q.· ·And what were those funds used for?
> A.· ·Payroll.
> Q.· ·Are you aware of whether those funds were used to pay off a CD that was used for collateral on a line of credit of Jack Dowdy?
> A.· ·I'm not aware of that, no.
> Q.· ·Are you aware of whether the funds were used to paid [sic] any employees of SAI?
> A.· ·No.

23.    Loan records from BancorpSouth show a monthly payment for the 2105 Waterview property of $11,472.38.  BancorpSouth posted the 2105 Waterview property for foreclosure on February 8, 2021 and foreclosed on the property on March 2, 2021.

24.    A "Notice of Paycheck Protection Forgiveness Payment" dated June 14, 2021, was issued to RKM pursuant to the CARES Act evidencing RKM's compliance with the PPP Loan Program and the resulting "forgiveness" of the PPP Loan to RKM.

25.    On July 28, 2022, the Surety obtained an Agreed Final Judgment for $6,350,000 in the Indemnity Action.

## DISCUSSION

The Bankruptcy Code requires discharge of the debtor unless a statutory exception applies. *Cadle Company v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009) (citing 11 U.S.C. §

727(a)).  The statutory exceptions are set forth in § 727(a) of the Bankruptcy Code.  These statutory

exceptions are construed narrowly against the creditor and liberally in favor of the debtor.  *Id.*

(citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997) )

In this proceeding, the Surety invokes § 727(a)(4) to deny the Debtor a discharge.  "Section

727(a)(4) conditions the debtor's discharge on his truthfulness."  *Duncan*, 562 F.3d at 695.  Section

727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless … the debtor

knowingly and fraudulently, in or in connection with the case … made a false oath or account…."

11 U.S.C. § 727(a)(4)(A).

The Surety claims the Debtor made two false oaths during his Bankruptcy Rule 2004

examination.  First, the Surety seeks a judgment denying the Debtor's discharge because the Surety

contends that he falsely testified that all the $17,000 in monthly rent payments received by

Waterview Realty went toward the BancorpSouth note when, in fact, the note payment was only

$11,472.38.  Second, the Surety seeks a judgment denying the Debtor a discharge because the

Surety contends that the Debtor falsely testified that all the PPP Proceeds were used by RKM for

"payroll" when, in fact, RKM used most of the PPP Proceeds to pay off a loan it had taken to pay

outstanding payroll taxes.

### Standards for Denial of Discharge Under § 727(a)(4)(A)

For the Court to deny the Debtor a discharge under § 727(a)(4)(A) of the Bankruptcy Code,

the Surety must prove by a preponderance of evidence that: "(1) the debtor made ... a statement

under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor

made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy

case."  *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001) (citing

*Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).  Under Bankruptcy

Rule 4005, the Surety bears the initial burden to present evidence that establishes a prima facie case for denial of discharge.  *In re Duncan,* 562 F.3d at 696.  *See also* FED. R. BANKR. P. 4005 ("At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection.").  Once it reasonably appears that the Debtor made a false oath, the burden shifts to the Debtor "to present evidence that he is innocent of the charged offense." *Id.*

The requisite "intent to defraud must be actual, not constructive," but may "be inferred from the actions of the debtor and may be proven by circumstantial evidence." *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005).  The Fifth Circuit has listed the following factors to consider when determining fraudulent intent: "(1) [T]he lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989) (quoting *Fox v. Schmit (In re Schmit)*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

With respect to the fifth element under § 727(a)(4)(A) – whether the statements related materially to the debtor's bankruptcy – the Fifth Circuit has held: "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Beaubouef,* 966 F.2d at 178.  "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings,

or the existence and disposition of his property." *Id.* at 178 (quoting *In re Chalik,* 748 F.2d 616, 617 (11th Cir. 1984)).

In *Beaubouef,* the debtor failed to disclose his interest in a company in his bankruptcy schedules, even though he had disclosed the same ownership interest in a life insurance application one week prior to the bankruptcy filing. Further, the debtor failed to amend his schedules to reflect his ownership interest in another company for more than six months after the initial meeting of creditors held pursuant to § 341 of the Bankruptcy Code. The Fifth Circuit upheld the bankruptcy court's denial of discharge, holding that debtor's conduct amounted to a false oath under § 727(a)(4)(A). The Fifth Circuit held that the debtor's failure to take advantage of the opportunity to clear up all omissions when he filed his amended schedules, combined with the multiple falsehoods, constituted "reckless indifference to the truth and, therefore, the requisite intent to deceive." *Id.* The Fifth Circuit further rejected debtor's contentions that the non-disclosures were immaterial, reasoning that a false oath is material "if it bears a relationship to the bankrupt's business transactions or estate." *Id.*

### Debtor's Federal Rule 52(c) Motion

At the close of the Surety's case-in-chief, the Debtor orally moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), as adopted and applied to this proceeding by Federal Rule of Bankruptcy Procedure 7052. Federal Rule 52(c) provides: "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Federal Rule 52(c) does not require the bankruptcy court "to draw any inferences in favor of the non-moving party" and permits the court to make a determination "in accordance with its own view of

9

the evidence." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 n.1 (5th Cir. 2011) (citing *Ritchie v. United States*, 451 F 3d 1019 1023 (9th Cir. 2006).

Here, the Court deferred its ruling on the Debtor's Federal Rule 52(c) motion at trial. Having now considered all the evidence, the Court concludes that the Surety met its *prima facie* burden to present evidence of false statements, and the Debtor's Federal Rule 52(c) motion for partial judgment is therefore denied. The Surety produced evidence that the challenged statements reasonably appeared false, and the burden shifted to the Debtor to come forward with evidence to prove that his misrepresentations were not intentional or provide some other credible explanation. *See, e.g., Baron v. Klutchko (In re Klutchko),* 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005) (holding that burden shifts when it reasonably appears that the oath is false).

### Waterview Realty's Use of Rental Income

As the Debtor pointed out in his oral motion under Federal Rule 52(c), his statement regarding Waterview Realty's use of its rental payments was hardly mentioned during the Surety's case in chief. The Surety nonetheless established that his statement that Waterview Realty used "100%" of its rental income to pay BancorpSouth was technically inaccurate. However, the Surety presented no evidence that the Debtor intended his testimony to be misleading. The Debtor is not financially sophisticated and had delegated the financial aspects of running Waterview Realty to others. The Debtor told the Surety that he guessed the monthly rental payments were about the same as the amount Waterview Realty owed to BancorpSouth on the note, and that all of the rental payments were being paid to BancorpSouth to stay current.

It appears from the transcript of the Bankruptcy Rule 2004 examination that the Debtor, who is a non-lawyer, responded inartfully to a general question by the Surety about Waterview Realty's rental income. The Debtor contends that what he meant when he said 100% of the rents

went to BancorpSouth was that none of the rental income had been paid to him (or to his father, Jack, who was a subject of the Surety's inquiry) or used for any illegitimate purpose. Rather, he meant to convey that Waterview Realty used 100% of the rents received from the property to pay the costs and expenses of owning and operating the property, including payments on the note and monthly expenses (such as janitorial services).

The Court, having considered the credible evidence presented at trial, finds and concludes that the Surety failed to establish that the Debtor made a false statement with actual intent to defraud as to Waterview Realty's use of its rental income.

### RKM's Use of PPP Proceeds

Next, the Surety contends that the Debtor falsely stated that RKM used the PPP Proceeds for "payroll."[1] The bulk of the PPP Proceeds were not used for RKM's future payroll. Rather, RKM used nearly all of the PPP Proceeds to pay off the debt it owed to Independent Bank.

The Court, having considered all the evidence, finds that the Debtor's testimony that RKM used the PPP Proceeds for "payroll" was ambiguous, but it was generally correct. The Debtor presented evidence at trial that, after RKM received the PPP Proceeds, it paid off a loan it had taken to pay outstanding payroll taxes, moved employees from SAI back onto its payroll, and then paid those employees more than the total amount of the PPP Proceeds. The PPP Proceeds were not retained or used by the Debtor. Further, RKM established to the satisfaction of the U.S. Small Business Administration and Bank of Oklahoma that it had complied with the Paycheck Protection Program, and RKM's loan has been forgiven.

---

[1] The Surety initially contended that $3 million of the PPP Proceeds remained unaccounted for. The Surety dropped this contention during trial after the Debtor provided the Surety with more information regarding RKM's payroll.

For all these reasons, the Court finds and concludes that the Surety failed to establish that the Debtor made a false statement with actual intent to defraud as to RKM's use of the PPP Proceeds.

## CONCLUSION

For all the foregoing reasons, the Court concludes that the Surety's objection to the Debtor's discharge should be denied.  The Court will enter a separate judgment consistent with this memorandum opinion.

Signed on 09/26/2023

*Brenda T. Rhoades*          SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE